G. E. GOFF, Administrator of D. C. GOFF, v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 25 February, 1920.)

1. **Railroads—Negligence—Signals—Crossings—Collisions.**

    The failure of the engineer on the locomotive of a railroad train to ring the bell or blow the whistle or give other warning as the fast moving train approached a grade crossing with a much used street in a populous town, where the approaching train was obscured from the view of those using the highways, is evidence of actionable negligence in an action to recover damages brought by one who was injured by a collision with the train while attempting to cross the track.

2. **Railroads—Crossings—Signals—Evidence—"Look and Listen"—Contributory Negligence—Negligence—Nonsuit—Trials.**

    Testimony of witnesses in circumstances and position to have heard the warnings given by whistle and bell, etc., of the locomotive of a train approaching a grade crossing, that they did not hear such warnings, is sufficient to sustain a verdict that they were not in fact given, and a judgment will be sustained in plaintiff's favor with this and with other evidence tending to show that the locomotive to defendant's train collided with the intestate's automobile and killed him, on a much used grade crossing in

Goff *v.* R. R.

a populous town, where the approaches of the public road were narrowed by ditches, the view of the railroad track obstructed by trees, bushes, and houses so that the train could neither have been seen nor heard by the intestate, and the burden of proof being on defendant to show the contributory negligence in failing to observe proper care before going on the track, a motion for a judgment as of nonsuit is properly denied.

**3. Railroads— Crossings— Collisions— Negligence— Contributory Negligence—Subsequent Negligence—Evidence—Nonsuit—Trials.**

Where there is evidence tending to show that the defendant's locomotive struck an automobile in which the plaintiff's intestate was crossing the railroad track at a grade crossed by a street in a city, and there is further evidence tending to show that the engineer did not know until after the impact he had carried the automobile some 250 or 300 yards, with the intestate therein, apparently alive and unharmed, and that his death was then caused by the automobile striking a signal post along the right of way, it is sufficient to take the case to the jury upon the question of the defendant's negligence causing the death after the collision at the crossing irrespective of the negligence of the defendant and contributory negligence of the intestate at that time, or previous thereto, and a motion as of nonsuit is properly overruled.

CLARK, C. J., concurring.

APPEAL by defendant from *Devin, J.*, at the November Term, 1920, of EDGECOMBE.

This is an action to recover damages for the negligent killing of plaintiff's intestate, D. C. Goff, at the public crossing in Rocky Mount at Gay's store on Cokey Road.

The allegations of negligence are that the defendant allowed trees and bushes to grow on its right of way, and failed to give the signals to travelers required at crossings by ringing the bell and blowing the whistle or otherwise, at the proper time, in order to warn the travelers of the approach of the train, and caused plaintiff's intestate to enter on the right of way with his car in motion, and to undertake to cross over said railroad, and negligently caused said train to pass over said crossing at an excessive, rapid, reckless, and unusual rate of speed, to wit, more than 50 miles an hour, and without keeping any lookout on part of its engineer and fireman; and after plaintiff's automobile was stricken by the engine of said train it was negligently carried, with plaintiff's intestate in same, over 300 yards on front of said engine until it struck a switch post standing close to the track, when said automobile and plaintiff's intestate were hurled violently to the ground and plaintiff killed; that the engineer and fireman failed to keep a proper lookout for the protection of travelers on said road passing over said crossing, and that if they had kept a proper lookout they could have seen said automobile as it reached the crossing, and was picked up by the engine, and avoided carrying same until it struck a switch post and violently hurling the auto and plaintiff's intestate to the ground and killing him.

The defendant denied that it was negligent, and pleaded that the death of the plaintiff's intestate was caused by his own contributory negligence.

At the conclusion of the evidence the defendant moved for judgment of nonsuit, which was overruled, and the defendant excepted.

The defendant also excepted to the submission of the third issue to the jury upon the ground that there was neither allegation nor proof to support it.

The defendant also excepted to the charge of the court upon the third issue upon the ground that there was no evidence that the intestate was not mortally injured by the collision at the crossing.

The defendant also excepted because of refusal to give the following instruction to the jury: "The burden is on the plaintiff to satisfy you by the greater weight of the evidence that the deceased, before attempting to cross the railroad, listened and looked in both directions to ascertain if a train was approaching; so if the plantiff has not satisfied you that the deceased did listen and look in both directions for an approaching train before attempting to cross the track, you are instructed to answer the issue as to contributory negligence 'Yes.' "

The jury returned the following verdict:

"1. Was plaintiff's intestate killed by negligence of defendant, as alleged in the complaint?  Answer: 'Yes.'

"2. Did plaintiff's intestate, by his own negligence, contribute to his injury and death, as alleged in the answer?  Answer: 'No.'

"3. Was the death of plaintiff's intestate caused by the negligence of the defendant in failing to stop its train in time to prevent the automobile from being thrown against the switch post, after said automobile had been struck by the engine, as alleged in the complaint?  Answer: 'Yes.'

"4. What damage, if any, is plaintiff entitled to recover of the defendant?  Answer: '$18,000.' "

Judgment was entered upon the verdict for the plaintiff, and the defendant excepted and appealed.

*J. B. Ramsey and W. O. Howard for plaintiff.*
*F. S. Spruill and John L. Bridgers for defendant.*

ALLEN, J.  The motion for judgment of nonsuit is upon the ground, (1) that there is no evidence of negligence; (2) that the plaintiff's intestate was guilty of contributory negligence in any view of the evidence.

If the first position can be maintained, the defendant is entitled to a reversal of the judgment, but the same result does not necessarily follow if the plaintiff's intestate was guilty of contributory negligence, because

it has been found in answer to the third issue that whether plaintiff's intestate was negligent or not, the defendant could have avoided killing the deceased but for its negligent failure to stop after the automobile was struck, and caught on the front of the engine.

Is there evidence of negligence? In *Bagwell v. R. R.,* 167 N. C., 615, the Court quotes with approval the following from *Edwards v. R. R.,* 132 N. C., 100: "It is undoubtedly true that the engineer must give such signal as will be reasonably sufficient to warn persons on highways that intersect the track of the coming of the train, and this must be done by ringing the bell or blowing the whistle, as the peculiar circumstances of the case may suggest to be the proper method, and the failure of the engineer to give such signal would be evidence of negligence. *Hinkle v. R. R.,* 109 N. C., 473; 26 Am. Rep., 581. The warning must be reasonable and timely, but what is reasonable and timely warning must depend upon the conditions existing at the time in the particular case, and we are not by any means prepared to say that the law requires in every case that the signal should be given in any special way. We know of no such hard and fast rule as that laid down by the trial judge in this case. The bell and the whistle are the appliances provided for the purpose of giving signals, and one or the other, as the case may seem to require, must be used for that purpose, and, in cases of emergency or when the peculiar situation seems to demand it, there should perhaps be a resort to the use of both; but it must be left to the jury to decide, upon proper instructions of the court as to the law, what is the proper signal in any given case."

It was also held in *Edwards v. R. R.,* 129 N. C., 79, "That the testimony of a witness that he did not hear either the whistle or the bell, although in a position where he might reasonably have heard either, is sufficient evidence for the consideration of the jury. It *tends* to prove that neither the whistle nor the bell was sounded; but whether it *does* prove it is for them alone to decide."

Applying these principles, the plaintiff was entitled to have his cause of action considered by the jury.

The plaintiff's intestate was driving his automobile at a moderate rate of speed on the Cokey public road, which crosses the railroad of the defendant within the corporate limits of Rocky Mount, and as he attempted to cross the track he was stricken by the train and injured.

One witness testified: "A man coming up to the crossing and car moving he could not turn to either side; there are ditches on both sides. I have seen cars have wrecks there on both sides to keep out of way of trains. Rocky Mount has about 21,000 people. This crossing is in the town limit; is built up about there. I guess built up about four blocks towards Tarboro. The crossing is used a whole lot. Two main roads

across it; somebody crossing most of the time; all the county south side Norfolk-Carolina and east of W. and W. Railroad; this is the only crossing in this section."

J. O. Joyner, who was at Gay's store, within 100 feet of the crossing, testified: "Did not hear any whistle; bell was not ringing; didn't see train until after it struck auto."

Jesse Calhoun, also at Gay's store, says: "Don't remember hearing any signal." Frank Carter, who was at his home, 150 feet from crossing: "Didn't hear it blow. I can hear train blow at crossing at my house. Has blown heap of times when I didn't hear it." Mrs. Moore, within 100 yards of crossing: "I noticed the train coming at extra speed. Didn't hear whistle blow."

W. H. Gay: "I was in store; I guess store is about 10 steps from right of way. Did not hear any signal of train; heard the smash, and saw auto wheel rolling between spur track and railroad; kinder in direction train was going."

This was sufficient to be submitted to the jury on the question of the failure of the defendant to give any notice of the approach of its train to a much-used public crossing, and if it failed in the performance of this duty it was guilty of negligence.

There is also evidence that no proper lookout was maintained.

The fireman on the engine testified that he saw the intestate approaching the track, driving about eight miles an hour, and that he said nothing to the engineer until after the collision, and a witness testified he heard the engineer say "he didn't know he hit any one until car struck switch," which was 300 or 350 yards beyond the crossing.

There is evidence of contributory negligence, in that the intestate, by the exercise of proper care, could have heard the roar of the train, or could have seen it in time to stop before entering upon the track, but it is not so conclusive that it can be declared as matter of law.

The principles applicable to this phase of the case are accurately stated in *Johnson v. R. R.,* 163 N. C., 443.

"4. On reaching a railroad crossing, and before attempting to go upon the track, a traveler must use his sense of sight and of hearing to the best of his ability under the existing and surrounding circumstances— he must look and listen in both directions for approaching trains, if not prevented from doing so by the fault of the railroad company, and if he has time to do so; and this should be done before he has taken a position exposing him to peril or has come within the zone of danger, this being required so that his precaution may be effective. *Cooper v. R. R.,* 140 N. C., 209; *Coleman v. R. R.,* 153 N. C., 322; *Wolfe v. R. R.,* 154 N. C., 569, in the last of which cases the rule was applied to an employee charged with the duty of watching a crossing and warning travelers of

the approach of trains, and he was required to exercise due care, under the rule of the prudent man, for his own safety by looking and listening for coming trains.

"5. The duty of the traveler arising under this rule is not always an absolute one, but may be so qualified by attendant circumstances as to require the issue as to his contributory negligence, by not taking proper measures for his safety, to be submitted to the jury. *Sherrill v. R. R.,* 140 N. C., 255; *Wolfe v. R. R., supra.*

"7. If his view is obstructed or his hearing an approaching train is prevented, and especially if this is done by the fault of the defendant, and the company's servants fail to warn him of its approach, and induced by this failure of duty, which has lulled him into security, he attempts to cross the track and is injured, having used his faculties as best he could, under the circumstances, to ascertain if there is any danger ahead, negligence will not be imputed to him, but to the company, its failure to warn him being regarded as the proximate cause of any injury he received. *Mesic v. R. R.,* 120 N. C., 490; *Osborne v. R. R., supra,* 160 N. C., 309." '

One witness described conditions on the day of the accident: "There is a good scope of woods before you get to the railroad. There is a good lot of buildings at crossing. If a train happened to be close by you could see it when you first got to the buildings. That is a map of the crossing, the road curves a little to the right going into Rocky Mount. Several houses alongside the country road, see map, about six. You could see right here, indicate on the map, if along there would have to see the train in front, before reaching the right of way, would have to see between the buildings, but the train would be ahead of him going west, there is a lumber shed, boiler room, stable, warehouse, and Gay's store, indicates on map, explain map to jury, the map does not show bushes, ditches, and trees, unless he could catch the train between there, those narrow spaces, he could not see it at all, he would be right on the train before he could see it. The sweet gum bushes are right smart higher than my head; they were (as high) as my head then. A traveler coming on the right of way after he had cleared the bushes and got a clear view of the train coming, could not turn to the right or left; there were ditches along there; there was a ravine on each side of the road."

Another witness: "Between Cokey road and right of way of railroad one-quarter of a mile, three dwellings, storage house, lumber and boiler room, and stables further down in edge of woods, pointed houses on map, they obstruct view of railroad. In space between Cokey road and railroad right of way, trees, shrubs and large trees growing; a ditch runs across the crossing, and it has some growth on it. On the right of way the crossing is narrow, wide enough for two to pass in vehicles; ditches on each side of the crossing. I estimate two or three feet deep."

Another witness: "Good many buildings between road and right of way; very hard to see train; have to catch glimpses between buildings; traveler could not catch sight of train until he had passed lower building and got on right of way; there are some bushes, some high as the house, between Dozier and Thorne's storage house and the railroad track; there is a ditch there on the right of way; I don't think that they have ever crossed the ditch and cut any trees down; right of way is clear between ditch and railroad."

W. L. Dunn testified: "There are some buildings and mill along the track, and I think they would cut off from a person going to Rocky Mount the sound of a coming train; don't think you could hear it unless it blowed."

The inference is permissible from this evidence that the view and hearing were so obstructed that the intestate could not see or hear the approaching train in time to avoid the collision by the exercise of ordinary care, and if so, the question was for the jury.

If, however, the intestate was negligent in entering upon the track without looking and listening, this would not bar a recovery because of the finding on the third issue, which is supported by allegation and proof.

The plaintiff alleges that the defendant "could have seen said automobile as it reached the crossing and was picked up by the engine and avoided carrying said automobile of plaintiff's intestate, with plaintiff's intestate in same, more than 200 yards, and violently hurling said automobile and plaintiff's intestate to the ground, and thereby avoided killing him; that the said engineer and fireman negligently failed and omitted to keep any lookout at all, and did not know of the collision until plaintiff's automobile, with· plaintiff in same, had been carried more than two city blocks, and until the automobile struck a switch post, and plaintiff's intestate and his automobile were hurled to one side, and made no effort whatever to stop said train until said switch post was stricken by said automobile."

Frank Carter testified: "At the time of accident I was standing on end of front porch next to the railroad. I went out to look at the train. I saw a man sitting in the car on the pilot of the engine, and about that time it threw the car off, and threw the man up as high as the engine; the man's back was towards me like he was holding the steering wheel of the car. If the man had been going towards Rocky Mount and crossing from the south to the north the position he was sitting was the natural position; when the train got to the switch it threw the car off; one end got on the switch and it threw the man about as high as the engine. He was laying in the path at the end of the crossties when I got there. After the auto struck the switch, the train stopped in less than a car length of the whole train. Speed of train was

35 or 40 miles an hour. I didn't see train at Cokey crossing; don't think it slackened; didn't act like it; didn't hear any brakes applied."

T. J. Bullock says: "Heard engineer say train was a little late; said he didn't know anything was on cow catcher until he struck switch post, and then he began to slow up."

There was also evidence that it was a light train, and that the switch post was 300 or 350 yards from the crossing.

This evidence justifies the findings, incorporated in the third issue; that the intestate was not killed at the crossing; that his car was struck and carried on the front of the engine 300 or 350 yards to the switch post; that during this time the intestate was sitting in his car with his hand on the steering wheel; that the car struck the post and the intestate was then killed; that the engineer did not know anything was on his engine; that he did not slacken speed until he struck the post, and that if he had been keeping a proper lookout he would have known of the collision at the crossing and could have stopped the train before it reached the post, and thus have avoided killing the deceased.

There is an exception to a charge upon the third issue upon the ground that there is no evidence the intestate was not killed at the crossing, which is covered by what has already been said.

The prayer for instruction on contributory negligence could not have been given, because it placed the burden on the plaintiff, when the law requires the defendant to plead and prove contributory negligence.

There is no exception to the amount of damages assessed.

No error.

CLARK, C. J., concurs in the opinion of *Allen, J.*, and further says: Any collision between a train and a vehicle of any kind at a crossing is *prima facie* negligence on the part of the company. The public have a right to use their roads, and the right of the railroad to cross is in subordination thereto. The population of the country is increasing steadily, and in addition to the ordinary vehicles there are now more than 100,000 automobiles and motor trucks licensed by this State, besides a large number from other States passing through this State. It is not reasonable to expect that this immense volume of business can cross and recross the railroad tracks of this State without frequent loss of life or personal injuries. It is therefore negligence on the part of the railroad not to abolish all grade grossings and to make their crossings of public roads in every instance either above or below the surface except when for sufficient cause the Corporation Commission may authorize gates and a tender at exceptional crossings.

Whenever death or personal injuries occur at a crossing it is *prima facie* due to the negligence of the railroad company in crossing the public road upon the same grade. The burden should be upon the company

to prove that notwithstanding its negligence in maintaining a grade crossing, the death or injury would not have occurred but for the conduct of the party killed or injured.

Throughout Europe grade crossings are forbidden, and they have been abolished in Massachusetts, Connecticut, New York, New Jersey, and some other States. The U. S. Supreme Court has held that any State can require this to be done at the expense of the corporation. Our own statute, Rev., 1097 (2), confers upon the Corporation Commission power "to require the raising or lowering of a track at any crossing where deemed necessary." This was reënacted and emphasized, Laws 1907, ch. 469, sec. 1 (c).

The laws and the courts are not solely for the protection of property rights, but for the enforcement as well of the constitutional guarantee of the protection of life and limb.

This Court accordingly held, in *Greenlee v. R. R.,* 122 N. C., 977, and *Troxler v. R. R.,* 124 N. C., 189, that the absence of automatic car couplers was negligence *per se,* and hence an irrebuttable presumption. This negligence has now been made punishable by act of Congress, 3 U. S. Compiled Statutes, 3174.

This Court made a similar ruling as to the failure to adopt a "block system." *Stewart v. R. R.,* 137 N. C., 687, which was reiterated in the same case, 141 N. C., 253, and such system is now required by statute. Laws 1907, ch. 469, sec. 1 (b). There are other similar decisions of this Court as to other matters involving exposure to unnecessary dangers. The longer retention of grade crossings should be on the same footing as the lack of car couplers and block systems. As *Lord Chancellor Erskine* observed, when at the bar, "Morality comes in the cold abstract from the pulpit, but men smart practically under its lessons when juries and judges are the teachers."

The General Assembly can make the abolition of grade crossings by railroads imperative instead of leaving it, as now, unexercised in the discretion of the Corporation Commission, and can place the cost of doing so upon the corporations, whose duty it is to remove them. *R. R. v. Minn.,* 208 U. S., 583, cited *R. R. v. Goldsboro,* 155 N. C., 362. In the meantime, like any other collision, or a derailment, the act itself is *prima facie* negligence on the part of the railroad company. *Marcom v. R. R.,* 126 N. C., 200.

This matter has heretofore been called to the public attention in *Cooper v. R. R.,* 140 N. C., 228-9; *Wilson v. R. R.,* 142 N. C., 348-9; *Gerringer v. R. R.,* 146 N. C., 35-37; *R. R. v. Goldsboro,* 155 N. C., 360-362, 364 (affirmed on writ of error, 232 U. S., 548); *McMillan v. R. R.,* 172 N. C., 857-860 (where the matter is fully discussed with full citation of authorities), and *Borden v. R. R.,* 175 N. C., 179.