WALKER, J., dissenting.
This is one of three actions, two to recover damages for personal injury, and the third, damages for loss of services of a minor son, brought on account of injuries sustained at a public crossing by the train of the defendant striking an automobile in which the plaintiffs were.
The plaintiff Perry was driving the automobile. He testified as follows: "I was 55 years old last August, and live near Okisko. The railroad crosses the public road at Pasquotank station. The road has been there ever since I can remember. It was there and maintained by the county at the time the railroad laid its track across it, and has been there ever since. It is the main road. It is traveled more than any road we have. It is about the only way, except by going around by Okisko to come to Elizabeth City.
"I was hurt on 16 August, 1918, somewhere between three and four o'clock in the afternoon. I was going home. I live about one and one-half miles or one and one-fourth miles from Pasquotank station. In going from Elizabeth City to my home I crossed the railroad at that station. The right of way of the railroad between the track and where its boundary was grown up in sycamore bushes, different kinds. The sycamore bushes there were higher than anything else, some eight or ten feet high, the sprouts sprouted off and made a pretty good clump; they had very wide leaves, so you could not see until you got up on the *Page 292 
railroad bed. The train was coming from my left. There is a field of corn that butts up to the right of way. I should judge the road is four or five hundred yards from the woods. The corn was eight or ten feet high.
"It is some thirty-three feet, I suppose, from the edge of the right of way to the middle of the track. You could not see up the road where the train was coming, until you climb on top of the road bed, because the bushes had grown up there and you could not see it. They were on the right of way. The train that struck me was known as `Waddy's train,' and was coming from Edenton going towards Norfolk. That was on my left. I was in a Ford automobile. I was not going over four or five miles at least at that time. I was climbing the road bed. Up to the time I got to the right of way I was going twelve or fifteen miles; that's as fast as I ever go any time. When I got to the right of way I slowed down. I heard no train, no sound.
"Q. Did you listen for one? A. Yes, sir.
"Q. And you didn't hear it? A. No, sir.
"Q. Did you look? A. Yes, sir. I never heard one until I got up to the track.
"Q. Did the train blow? A. I didn't hear it.
"Q. Ring any bell? A. I didn't hear it.
"Q. State what signal, if any, it gave crossing the public road? A. I didn't hear it.
"I was not running over four or five miles at the outside when I drove up the railroad. As I drove up on the track I had two others with me; Darius White, a young white man, and Mr. Oscar Bundy. When I drove up on the track the train looked as close as from here to that door. I reached down for the clutch and brake, and tried to back off, and by the time I got my foot on the clutch the train hit me. All the time I was slowing the automobile. The train was going at lease forty-five or fifty miles an hour. I just got the front wheels up on the track. It knocked us in every direction. I could not say how far, because I was knocked so badly I did not know but very little afterwards, until I was put in the hospital. I was knocked out of the car and alongside of the road bed. I was lying right side of the ties when the train was running by me.
"In August, 1918, Pasquotank was a flag-stop, and for this train, and it had been for a number of years before that. I knew that the trains of the Norfolk Southern never stopped at that station except when signaled to do so. They had sold no tickets there. I never bought any ticket there. There are three or four houses right near there. The nearest one is Mr. Henry Whitehead's. Mr. Whitehead had another little house acress the road which belonged to him. There are about six *Page 293 
houses within one-half mile. There are and never have been any gates across the railroad at that point. But there is and has been for the last eight or ten years, certainly, if not longer, a sign there, `Stop, look, and listen, railroad crossing.' That sign is there on the side of the county road on the other side of the railroad in the direction I was going. I could not say how long it has been there. I suppose five or six years. I suppose I saw it on the occasion in question. I don't know I was particularly noticing that one thing though. I know it was there then. The railroad is straight along there for a considerable distance. For a mile, as I understand it, clear to Okisko.
"Q. When did you slow down from twelve to four miles an hour? A. Right at the track.
"Q. How close to the track? A. Twenty-five or thirty yards I began to slow down.
"Q. You began to slow down when you were twenty-five or thirty yards away? A. Yes, sir.
"Q. You began to slow down then? A. It might have been sooner, I could not say.
"Q. Well sir, when did you commence to run at the rate of four miles an hour? A. When I was going up on the track.
"Q. How far from the track were you when you first commenced running four or five miles an hour? A. Well, I guess that track, you say, is thirty-three feet, I understood you? Q. Yes. A. For instance, when I struck the roadbed raise, that was when I was not running over four or five miles.
"Q. How fast were you running when you struck the right of way? A. I call it all the roadbed — the right of way. I am positive I was not running over four or five miles when I struck the right of way.
"I could have stopped my car in three feet or less. I did stop after I got on the track. I saw the sign up there for me to stop, look, and listen, and I did not stop until I got on the track. If I had stopped eight or ten feet from the track I might have heard the train. If I had stopped my car, no matter if the train was ringing the bell or sounding the whistle, I would have heard it coming, when it was a hundred yards from me, if I had looked in that direction. I can hear a train coming half a mile, and I can always hear it coming a quarter of a mile away, if I listen.
"Q. As a matter of fact, when you were as much as ten feet from the track, how far was the train from the crossing? A. I don't know about that. I never saw the train until I got up on the track. I never heard any noises, no sound, no whistle.
"Q. Well, you did not listen? A. I was running my car. *Page 294 
"Q. Well, if there was anything that kept you from hearing it on that day it was because your car was running, and not because the train was not making the usual amount of fuss? A. I don't know.
"Q. You won't say no? A. No.
"Q. If anything prevented your hearing that train on that day when you were ten feet from the track it was the running of your car? A. I could not say.
"Q. I understand you to say this: You can easily hear a train running on the track, whether it is blowing or sounding the whistle, as much as a quarter of a mile away? A. Well, it is owing to what you are in. Cars make a noise as well as the train.
"Q. Then if you can ordinarily hear it when it is that distance away when your car is not running, then if you don't hear it and your car is running, the reason you didn't hear it is because the car is running? A. Might have been; I don't know.
"If my car had not been running that day I suppose I would have heard the train when it was within one hundred yards of me. I could not say whether I have ever been within a hundred yards of a train running, and was in an automobile running at that time, and did not hear it. Most any man could hear a hundred yards if he had nothing to break the sound. I cannot tell the jury that the whistle did not blow or the bell did not ring."
There was other evidence in corroboration of the plaintiff.
The defendant introduced evidence tending to prove that the crossing was in good condition, and that the whistle was blown and the bell rung as the train approached the crossing.
There was a motion for judgment of nonsuit, which was overruled, and the defendant excepted.
There was a verdict and judgment for the plaintiffs, and the defendant appealed.
The principles announced in Goff v. R. R., 179 N.C. 219, fully sustain the ruling of his Honor in refusing to enter judgment of nonsuit.
It was there held that it was the duty of the defendant to give reasonable and timely notice of the approach of its train to a public crossing by ringing the bell or blowing the whistle, or by doing both when peculiar conditions demanded; that a failure to do so is negligence, and that the evidence of witnesses nearby who testify that they do not hear the ringing of the bell or the blowing of the whistle, is evidence that no such signal was given. *Page 295 
We also approved in that case the following principle as to the duty of the traveler as he approaches the crossing, laid down in Johnson v. R. R.,163 N.C. 443:
"4. On reaching a railroad crossing, and before attempting to go upon the track, a traveler must use his sense of sight and hearing to the best of his ability under the existing and surrounding circumstances — he must look and listen in both directions for approaching trains, if not prevented from doing so by the fault of the railroad company, and if he has time to do so; and this should be done before he has taken a position exposing him to peril or has come within the zone of danger, this being required so that his precaution may be effective. Cooper v. R. R.,140 N.C. 209; Coleman v. R. R., 153 N.C. 322; Wolfe v. R. R., 154 N.C. 569, in the last of which cases the rule was applied to an employee charged with the duty of watching a crossing and warning travelers of the approach of trains, and he was required to exercise due care, under the rule of the prudent man, for his own safety by looking and listening for coming trains.
"5. The duty of the traveler arising under this rule is not always an absolute one, but may be so qualified by attendant circumstances as to require the issue as to his contributory negligence, by not taking proper measures for his safety, to be submitted to the jury. Sherrill v. R. R.,140 N.C. 255; Wolfe v. R. R., supra.
"6. If he fails to exercise proper care within the rule stated, it is such negligence as will bar his recovery: Provided, always, it is the proximate cause of his injury. Cooper v. R. R., supra; Strickland v. R. R.,150 N.C. 7; Wolfe v. R. R., supra.
"7. If his view is obstructed or his hearing an approaching train is prevented, and especially if this is done by the fault of the defendant, and the company's servants fail to warn him of its approach, and induced by this failure of duty, which has lulled him into security, he attempts to cross the track and is injured, having used his faculties as best he could, under the circumstances, to ascertain if there is any danger ahead, negligence will not be imputed to him, but to the company, its failure to warn him being regarded as the proximate cause of any injury he received.Mesic v. R. R., 120 N.C. 490; Osborne v. R. R., supra."
The evidence in this case tends to prove that as the plaintiff approached the crossing his view was obstructed by bushes, which the defendant permitted to grow on its right of way so high and so close to the track that he could not see until he was on the track; that the bell was not rung and the whistle was not blown; that the plaintiff was traveling at from four to five miles an hour; that he looked and listened, and the inference is permissible that if notice of the approach of the *Page 296 
train to the crossing had been given that the plaintiff would have heard it and would not have gone on the track, and if so, the jury was justified in finding that the failure to give notice caused the plaintiff to go upon the track and was the proximate cause of his injury.
Some authorities impose the further duty on the plaintiff of stopping before reaching the crossing, while others hold that this cannot be declared as matter of law, but that a failure to do so is a circumstance to be considered on the exercise of ordinary care by the plaintiff.
The authorities representing the opposing views are collected in the notes to Wacksmith v. R. R., 1913 B. Anno. Cases, 681, but as the question has been decided by this Court four times in recent years, as applied to collisions between automobiles and trains at public crossings, and a definite conclusion reached without dissent, we do not regard it as needful or helpful to go outside of our own authorities, and reexamine the decisions of other Courts, which we have heretofore fully considered.
Shepard v. R. R., 166 N.C. 545, was an action to recover damages to an automobile caused by collision with a train at a crossing, and the question was raised as to the duty of the driver to stop, and the Court said: "It is also established by the weight of authority that it is not always imperative on a traveler to come to a complete stop before entering on a railroad crossing; but `whether he must stop, in addition to looking and listening, depends upon the facts and circumstances of each particular case, and so is usually a question for the jury.' Alexander v. R. R.,112 N.C. 720; Judson v. R. R., 158 N.Y. 597; Malott v. Hawkins,159 Ind., pp. 127-134; 3 Elliott on Railroads (2 ed.), sec. 1095, note 147; 33 Cyc., pp. 1010, 1011-1020."
A new trial was ordered because of an error in the charge, and on a second appeal (169 N.C. 239) the principles declared on the first appeal were not only affirmed, but the Court proceeded a step further and held that the plaintiff could recover although he approached the crossing running in excess of the speed limit prescribed by statute, unless it appeared that the excess of speed was the proximate cause of the collision, and that this was for the jury.
Hunt v. R. R., 170 N.C. 444, was an action to recover damages for wrongful death caused by a collision between an automobile and a train at a crossing, in which the Court says: "There was evidence tending to show that the driver of the automobile looked and listened before entering on the crossing, and it is held with us that it is not always, and as a matter of law, required that a vehicle should come to a stop before endeavoring to cross. Shepard v. R. R., 166 N.C. 539, and Elkin v. R. R., 86 S.E. 762."
Brown v. R. R., 171 N.C. 269, is another action to recover damages for injury at a crossing caused by collision between an automobile and *Page 297 
a train. Walker, J., writing the opinion for the Court, reviews the authorities, and, among other things, declares: "We held in Shepard v. R.R., 166 N.C. 539, following two of the rules laid down in Cooper v. R. R.,140 N.C. 209, and Johnson v. R. R., 163 N.C. 431, as follows: `Where the view is unobstructed, a traveler who attempts to cross a railroad track under ordinary and usual conditions without first looking, when by doing so he could see the approach of a train in time to save himself by reasonable effort, is guilty of contributory negligence. Where the view is obstructed, a traveler may ordinarily rely upon his sense of hearing, and if he does listen and is induced to enter on a public crossing because of the negligent failure of the company to give the ordinary signals, this will usually be attributed to the failure of the company to warn the traveler of the danger, and not imputed to him for contributory negligence.' . . .Shepard's case was again before the Court, and is reported in 169 N.C. 239, where the former decision was approved, and where it was further held that if plaintiff (in that case) was running his automobile at a rate of speed prohibited by the statute (Laws 1913, ch. 107), he was not, as a matter of law, debarred of a recovery, as the question of proximate cause was involved and was for the jury to determine."
And again, referring to Shepard's case: "In that case, at p. 545, the Court said: `It is also established by the weight of authority that it is not always imperative on a traveler to come to a complete stop before entering on a railroad crossing'; but `whether he must stop, in addition to looking and listening, depends upon the facts and circumstances of each particular case, and so is usually a question for the jury.'"
These three cases of Shepard v. R. R., Hunt v. R. R., and Brown v. R. R. are cited and approved in Dail v. R. R., 176 N.C. 112, on the point that failure to stop before crossing a railroad track cannot be declared to be contributory negligence as matter of law, but that it should be considered by the jury in connection with the surrounding circumstances in determining whether the party was exercising the care of one of ordinary prudence.
The authorities favoring this view proceed upon the idea that the traveler has the right to rely upon the performance of its duty by the defendant, and that when he looks and listens and neither sees nor hears a train, he has the right to act upon the presumption that none is approaching.
Also that while a failure to stop should be considered in connection with the other circumstances, it is not conclusive of negligence on the part of the plaintiff.
The sign placed at the crossing with the warning "Stop, look, and listen" has no other legal effect than to call the attention of the plaintiff *Page 298 
to the duty imposed upon him by law to exercise ordinary care for his own safety.
His Honor, however, gave the defendant the benefit of all it was entitled to, as he instructed the jury as follows: "If you shall find that the view down the railroad track was obstructed or restricted, and that the plaintiff could not hear on account of the noise of his automobile, then it was his duty to bring his car to a stop before entering upon the track, and to stop, look, and listen at a place where doing so would be effective, and if you find that there was a place on the road where the view was sufficiently open for him to have done so and have ascertained the approaching of the train, then his failure to do so was contributory negligence, and you will answer the second issue `Yes.'"
The evidence of the plaintiff that he might have heard the running of the train if he had stopped was submitted to the jury in support of the defendant's position, and was given the significance to which it was entitled.
The notice to which the plaintiff was entitled was not the noise of the moving train, but the blast of the whistle or the ringing of the bell, or both, and while he might have heard the train if he had stopped, it is also true that he might have been halted before he reached the track, with the car running, if the signals required by law had been given, and it could not be said to be contributory negligence as a legal conclusion if the failure to stop was caused by the breach of duty on the part of the defendant in that it failed to give any notice of the approach of its train.
Notice by bell or whistle is required, because the noise of the train, which is always present, is not a sufficient protection to life and property, and when the defendant has by its negligence permitted obstructions on its right of way so the traveler cannot see, and has failed to give the proper signal, which prevents him from hearing what he has the right to expect if a train approaches, it ought not to be absolved from the consequences of its negligence, because the traveler, relying on the performance of duty by defendant, might have heard the noise of a train if he had stopped.
There are several exceptions to the evidence, which we have examined, and none of them would justify ordering a new trial, nor do the other appeals involve additional questions which require discussion.
The case of Hurst v. R. R., which was disposed of by a per curiam
judgment in favor of the defendant, is in some respects like this, but the question on which it was decided was the condition of the crossing and not the failure to give notice of the approach of the train.
After careful examination of the record we find
No error. *Page 299